# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

```
                                )
CONRAAD L. HOEVER,              )
                                )
                                )
            Plaintiff,          ) Case No: 4:13-cv-549-MW
                                )
        v.                      ) Tallahassee, Florida
                                ) September 23, 2016
ROBERT MARKS, CALEB PAUL,       ) 8:12 a.m.
AND JOHN NUNEZ                  )
                                )
            Defendants.         )
_____ )
```

## VOLUME 3

**(Pages 563 through 647)**

**TRANSCRIPT OF JURY TRIAL**
**BEFORE THE HONORABLE MARK E. WALKER**
**UNITED STATES DISTRICT JUDGE**

<u>APPEARANCES</u>:

```
For the Plaintiff:        CONRAAD L. HOEVER, PRO SE
                          Madison Correctional Institution
                          382 SW MCI Way
                          Madison, Florida 32340


For the Defendants:       Office of the Attorney General
                          By:  MARCUS O. GRAPER
                               WILLIAM W. GWALTNEY
                               Attorneys at Law
                          400 South Monroe Street
                          Tallahassee, Florida 32399
                          marcus.graper@myfloridalegal.com
                          william.gwaltney@myfloridalegal.com
```

1            **P R O C E E D I N G S**

2            (Call to Order of the Court at 8:23 a.m. on the

3    23rd day of September, 2016.)

4            THE COURT:  We are here in Case No. 4:13cv549.  We

5    had a jury -- picked a jury on Wednesday.  Plaintiff put on

6    his case on Wednesday.  The defendants put on their case

7    yesterday, Thursday, September the 22nd.  We find ourselves

8    here on the morning of Friday, September the 23rd, for

9    closing arguments and jury instructions.

10           Last evening we had our charging conference and

11   made some modifications to both the verdict form and the

12   jury instructions.

13           The verdict form we had already admitted and given

14   copies to everybody, the instructions -- last evening after

15   counsel left, we went ahead and put -- before counsel left,

16   before you left we gave you a copy of the amended

17   instructions.

18           Anything further, Mr. Hoever?

19           MR. HOEVER:  No, Your Honor.

20           THE COURT:  Anything further from the defense?

21           MR. GRAPER:  Two things, Your Honor.  As always,

22   just preserve my same objections from the previous draft

23   before we move forward.

24           THE COURT:  Certainly.

25           MR. GRAPER:  And I know that we have the entered

```
1   exhibits.  Can I use a copy of these for expediency --
2            THE COURT:  You can use the copies or the
3   originals.  My only instruction was I don't want the
4   originals leaving the podium because I don't want them
5   wandering off because it takes us too long at the end of
6   closing arguments to gather them up.  I've had cases where
7   people have actually -- co-counsels have walked out of the
8   courtroom with some of the actual exhibits and then we have
9   to go hunt people down before we can give them to the jury.
10  So you absolutely can use copies.
11           Mr. Hoever, if you have a copy and don't want to
12  get them from the table, you can use them as well.
13           We have a lectern set up with a microphone in
14  front of the jury.  You can also do your closing arguments
15  using the evidence presentation system with the larger
16  podium behind the podium facing the jury.  We've got it set
17  up.  We have the monitor on over my shoulder that the jury
18  can see if you put something that's in evidence on the
19  overhead.  Though I will caution both Mr. Hoever and defense
20  counsel, of course, nothing that -- only that which has been
21  entered into evidence can be put on the overhead.
22           Yes, sir?
23           MR. GRAPER:  Can we turn the big podium?
24           THE COURT:  No.
25           MR. GRAPER:  No?
```

1           THE COURT:  If you do, you will be fined probably

2     $50,000 --

3           MR. GRAPER:  Okay.

4           THE COURT:  -- to replace the cables and stuff

5     that will be snapped if you try to move it.

6           MR. GRAPER:  The wheels are deceiving.

7           THE COURT:  They are.

8           It was shocking how expensive the evidence

9     presentation system was.  Had I known, y'all would not have

10    an evidence presentation system and we'd be waving papers.

11    We wouldn't have an evidence presentation system if it was

12    left up to me to spend that kind of money.

13          But no, there's -- kidding aside, there are all

14    kinds of cable, and I've been told that it could cause all

15    kinds of damage.  And we actually had to dig up the floor

16    and recarpet to get the cables there.  So the notion of

17    snapping cables and things, it could be a very expensive

18    proposition to replace the system.  That's why we put the

19    podium up here.  And you can move back and forth.  I have

20    lawyers do that all time.  They'll start their presentation

21    from the podium, and then at some point they walk back over

22    to the evidence presentation system when they actually want

23    to talk about documents.

24          Also -- and if anybody has any questions, you can

25    always ask Ms. Lourcey if you have any problems focusing a

 1    document and so forth.  So, Mr. Hoever, if you have a

 2    problem -- nobody seemed to have had a problem during the

 3    course of trial -- but if you have any problem, Ms. Lourcey

 4    will certainly help.

 5              MR. HOEVER:  Thank you, Your Honor.

 6              THE COURT:  All right.  Each side -- the defense

 7    had asked for 15 minutes.  Mr. Hoever had asked for

 8    approximately 40.  I said, How about 30?

 9              Mr. Hoever, do you believe you can do your

10    closings in 30 minutes?

11              MR. HOEVER:  I'll do my best, Your Honor.

12              THE COURT:  I can change it.  If you really think

13    you need 40 minutes, I'll give you 40 minutes.

14              MR. HOEVER:  I probably will need it.

15              THE COURT:  All right.  I'll give both sides

16    40 minutes.

17              But I will say, Mr. Hoever, that Judge Smoak, I

18    think, has said it best when he tries to remind lawyers --

19    and I'll remind you as well -- of what the one pastor said

20    to the other pastor; namely, Few souls are saved after

21    30 minutes.  So you would do well to remember that sitcoms

22    on TV are 30 minutes with commercial breaks for a reason.

23    The attention span of an average person is less than

24    30 minutes.  So the notion that anybody is going to get up

25    and talk at the jury, the concern is, and y'all can -- I've

```
1    let lawyers do it.  I had a prosecutor who talked himself

2    into a not guilty verdict in this very courtroom because he

3    gave a three-hour closing.

4           You do so at your own peril.  I just would remind

5    both sides, do not get lost in the forest.  If you start

6    talking about the, you know, mushrooms growing at the base

7    of each tree, you forget that your goal is to explain to the

8    jury what the forest really looks like in the big picture.

9    But if y'all want to talk about the mushrooms, y'all go

10   right ahead.  I'm not going to try the case for either one

11   of you; okay?

12          MR. HOEVER:  Because it's split, so that still

13   would keep it within 30 minutes, basically, the second part?

14          THE COURT:  How do you want to divide up your

15   time?

16          MR. HOEVER:  About 15 and 25.

17          THE COURT:  Do you want me to tell you at the end

18   of 15 minutes?

19          MR. HOEVER:  No, I'll pay attention.  It might be

20   less, but I'll pay attention.  But a warning at 10, 12

21   minutes would be fine.

22          THE COURT:  The only reason I'm asking is some

23   lawyers want me to and some lawyers don't.  I'm happy to

24   tell you at a certain -- and I tell the jury that we don't

25   have a computer system which does that, which is why I'm
```

 1   letting y'all know.

 2          Do you want me to tell you at a certain point in

 3   your first closing?

 4          MR. HOEVER:  At 10.

 5          THE COURT:  At 10 minutes, okay.

 6          And counsel for the defense?

 7          MR. HOEVER:  And to remind me that there's five

 8   minutes left.

 9          THE COURT:  That's fine.

10          MR. HOEVER:  Thank you, Your Honor.

11          THE COURT:  Do you want me to tell you at a

12   certain point?  You have 40 minutes, but do you want me to

13   tell you at a certain point?

14          MR. GRAPER:  I'm not going to take 40 minutes,

15   Your Honor, but maybe when I have 10 minutes left.

16          THE COURT:  I'll tell you after 30 minutes.

17          MR. GRAPER:  And, Your Honor, can I get another

18   copy of the verdict form?

19          THE COURT:  Sure, do you have an extra?

20          MR. GRAPER:  It's somewhere in all the other

21   papers.

22          THE COURT:  We'll get one printed for you.

23          How many jurors do we have?

24          COURT SECURITY OFFICER:  All of them.

25          THE COURT:  We have all of our jurors.  We'll get

1    the verdict form for you.

2            And I should also tell both of you that you

3    certainly can use the jury instructions or the verdict form,

4    the last copy, on the overhead.  So if somebody wants to

5    show somebody a verdict form and say, for example,

6    Mr. Hoever, "Ladies and gentlemen of the jury, you should

7    check 'yes' to each of these questions, and here's why,"

8    then you can have that on the overhead, show them the

9    verdict form, and you can even mark on your verdict form.

10   Lawyers do that all the time.

11           If you want to highlight a jury instruction,

12   lawyers often say, "The Judge has instructed you on the law

13   and, as he told you, X," if you want to highlight that by

14   putting some jury instruction up on the overhead, by all

15   means, do so.  Some people do it; some don't.

16           But if you want to do that, that's fair game.

17           All right.  What we'll do is we are going to bring

18   in the jury in five minutes, at 20 till.  If anybody needs

19   to use the restroom, they need to do so quickly.  But I need

20   everybody in their chairs ready to go at 20 of.

21           Thank you.

22           (The jury trial recessed at 8:32 a.m.)

23           (The jury trial resumed at 8:42 a.m.)

24           COURT SECURITY OFFICER:  All rise.

25           THE COURT:  Please take your seats.

```
1              Mr. Hoever, are you ready to proceed?

2              MR. HOEVER:  Yes, Your Honor.

3              THE COURT:  Is defense counsel ready to proceed?

4              MR. GRAPER:  Yes, Your Honor.

5              THE COURT:  And so y'all know, I'm referring y'all

6    collectively as "defense counsel," because I'm not sure who

7    is going to address.  I'm not trying to use a generic label.

8    My apologies.

9              My understanding is we have the jury ready.  So

10   you'll know, one of our jurors has indicated that their

11   stomach -- they may need to use the facilities because they

12   have some stomach issues, but they are fine otherwise.  And

13   I've directed them through -- I didn't talk to them, but

14   through the court security officers, have directed them that

15   all she has to do is get up.  We'll stop talking.  She'll

16   use the facilities, and then she'll come back.  So if I

17   motion to any of the lawyers or Mr. Hoever to stop talking,

18   it's so the juror can get out of the courtroom.

19             Okay.  And we'll just restart the clock.

20             Let's bring in the jury.

21             COURT SECURITY OFFICER:  All rise for the jury.

22             (The jury entered the court room.)

23             THE COURT:  Please take your seats.

24             Welcome back, ladies and gentlemen of the jury.

25             I see Mr. Johnson had some laundry issues.
```

```
 1              (Laughter.)
 2              THE JUROR:  I wore it for you, Your Honor.
 3              THE JUROR:  Go Noles.
 4              COURT SECURITY OFFICER:  I need to get a woman's
 5    glasses.
 6              THE COURT:  We'll start in just a moment.  One of
 7    the jurors left their glasses in the jury room.
 8              THE JUROR:  Sorry.
 9              THE COURT:  No worries.  I ask y'all to ask, and
10    that's why we are doing this.
11              So you'll know, you've got your jury instructions
12    in your chair.  Once we get the glasses back, we'll get
13    started.  I'm going to read you the jury instructions, and
14    I'll remind you that if during the course of closing
15    arguments or something you write on the jury instructions,
16    that's fine.  Your jury instructions are going to be treated
17    just like your notes.  They're going to be shredded at the
18    end of the case, and they're yours to take back and use
19    during deliberations.
20              So what I'm going to do is I'll read the
21    instructions to you.  We'll then turn it over to the lawyers
22    and Mr. Hoever to make closing arguments.  And then you'll
23    retire to begin your deliberations.
24              I'll remind you, again, that when Mr. Hoever is
25    acting as a lawyer, when he makes closing arguments, he's
```

```
 1    acting as a lawyer, so his statements are not evidence.  So

 2    when I refer to things not being evidence because they're

 3    said by lawyers, I'm also including any time Mr. Hoever is

 4    acting as a lawyer, as I told you during preliminary

 5    instructions.

 6                (Discussion was held off the record between the

 7    jurors regarding the juror's glasses.)

 8                THE JUROR:  I'm sorry.

 9                THE COURT:  I want you to have your glasses.

10                There's about a 50/50 chance that I leave mine in

11    chambers every time I walk into the courtroom, so...

12                (Pause in proceedings.)

13                THE COURT:  Is that the right one?

14                THE JUROR:  Yep.

15                THE COURT:  And, Officer, that looks lovely with

16    your jacket.

17                (Laughter.)

18                COURT SECURITY OFFICER:  Thank you, Your Honor.

19                THE COURT:  Ladies and gentlemen of the jury, I

20    now will direct your attention to the jury instructions.

21                Members of the jury, it's my duty to instruct you

22    on the rules of law that you must use in deciding this case.

23                When I have finished you will go to the jury room

24    and begin your discussions, sometimes called deliberations.

25                Your decision must be based only on the evidence
```

1    presented here.  You must not be influenced in any way by

2    either sympathy for or prejudice against anyone.

3           You must follow the law as I explain it, even if

4    you do not agree with the law, and you must follow all of my

5    instructions as a whole.  You must not single out or

6    disregard any of the instructions on the law.

7           As I said before, you must consider only the

8    evidence that I have admitted in the case.  Evidence

9    includes the testimony of witnesses and the exhibits

10   admitted.  But, anything the lawyers say is not evidence and

11   isn't binding on you.

12          You shouldn't assume from anything I have said

13   that I have any opinion about any factual issue in this

14   case.  Except for my instruction to you on the law, you

15   should disregard anything I may have said during the trial

16   in arriving at your own decision about the facts.

17          Your own recollection and interpretation of the

18   evidence is what matters.

19          In considering the evidence, you may use reasoning

20   and common sense to make deductions and reach conclusions.

21   You shouldn't be concerned about whether the evidence is

22   direct or circumstantial.

23          Direct evidence is the testimony of a person who

24   asserts that he or she has actual knowledge of a fact, such

25   as an eyewitness.

1          Circumstantial evidence is proof of a chain of

2     facts and circumstances that tend to prove or disprove a

3     fact.  There is no legal difference in the weight you may

4     give to either direct or circumstantial evidence.

5          When I say you must consider all the evidence, I

6     don't mean that you must accept all the evidence as true or

7     accurate.  You should decide whether you believe what each

8     witness had to say and how important that testimony was.  In

9     making that decision, you may believe or disbelieve any

10    witness in whole or in part.  The number of witnesses

11    testifying concerning a particular point doesn't necessarily

12    matter.

13         To decide whether you believe any witness, I

14    suggest that you ask yourself a few questions:

15         1.  Did the witness impress you as one who was

16    telling the truth?

17         2.  Did the witness have any particular reason not

18    to tell the truth?

19         3.  Did the witness have a personal interest in

20    the outcome of the case?

21         4.  Did the witness seem to have a good memory?

22         5.  Did the witness have the opportunity and

23    ability to accurately observe the things he or she testified

24    about?

25         6.  Did the witness appear to understand the

1   questions clearly and answer them directly?

2           7.  Did the witness's testimony differ from other

3   testimony or other evidence?

4           You should also ask yourself whether there was

5   evidence that a witness testified falsely about an important

6   fact.  And ask whether there was evidence that at some other

7   time a witness said or did something, or didn't say or do

8   something, that was different from the testimony the witness

9   gave during this trial.

10          To decide whether you believe a witness, you may

11   consider the fact that the witness has been convicted of a

12   felony or a crime involving dishonesty or a false statement.

13          But keep in mind that a simple mistake doesn't

14   mean a witness wasn't telling the truth as he or she

15   remembers it.  People naturally tend to forget some things

16   or remember them inaccurately.  So if a witness misstated

17   something, you must decide whether it was because of an

18   innocent lapse in memory or an intentional deception.  The

19   significance of your decision may depend on whether the

20   misstatement is about an important fact or about an

21   unimportant detail.

22          In this case it is the responsibility of

23   Mr. Hoever, as the plaintiff, to prove every essential part

24   of his claim by a preponderance of the evidence.  This is

25   sometimes called the burden of proof or the burden of

1    persuasion.

2          A "preponderance of the evidence" simply means an

3    amount of evidence that is enough to persuade you that

4    Mr. Hoever's claim is more likely true than not true.

5          If the proof fails to establish any essential part

6    of a claim or contention by a preponderance of the evidence,

7    you should find against Mr. Hoever.

8          When more than one defendant is involved, as here,

9    you should consider each claim separately against each

10   defendant.

11         In deciding whether any fact has been proved by a

12   preponderance of the evidence, you may consider the

13   testimony of all of the witnesses, regardless of who may

14   have called them, and all of the exhibits received in

15   evidence, regardless of who may have produced them.

16         If the proof fails to establish any essential part

17   of Mr. Hoever's claims by a preponderance of the evidence,

18   you should find for that defendant as to that claim.

19         Now, let me turn to the claims in this case.

20   Mr. Hoever claims that Mr. Marks, Mr. Paul, and Mr. Nunez,

21   while acting under color of law, violated his rights under

22   the First Amendment to the United States Constitution.

23         Specifically, Mr. Hoever claims that ma sures

24   Marks, Paul, and Nunez, while working as correctional

25   officers at Franklin Correctional Institution, intentionally

1   violated Mr. Hoever's constitutional right to free speech

2   and to petition the government for redress of grievances, by

3   threatening him because he filed grievances and lawsuits.

4           A convicted prisoner loses some constitutional

5   rights, such as the right to liberty, after being convicted

6   of a criminal offense.  But the prisoner keeps other

7   constitutional rights.  One of those retained rights is the

8   First Amendment right to free speech and to seek redress for

9   grievances regarding the constitutionality of his

10  confinement conditions.

11          Prisoners have a constitutional right to make

12  good-faith complaints about the conditions of their

13  confinement, whether made verbally or in writing.  The

14  exercise of that right cannot be the basis for a penalty or

15  punishment.  If Mr. Hoever could be punished for exercising

16  a constitutional right, the right itself would be

17  meaningless.

18          To succeed on this claim, Mr. Hoever must prove

19  each of the following four facts by a preponderance of

20  evidence:

21          First:  Mr. Hoever must prove that he engaged in

22  constitutionally protected speech.  It is an established

23  principle of constitutional law that an inmate is considered

24  to be exercising his First Amendment right of freedom of

25  speech when he complains to the prison's administrators

1    about the conditions of his confinement.

2           Second:  Mr. Hoever must prove that the defendants

3    intentionally violated his First Amendment rights.  More

4    specifically, Mr. Hoever must prove that the defendants were

5    aware of his protected speech and took retaliatory action as

6    a result of his protected speech.

7           Third:  Mr. Hoever must prove that the defendants

8    were acting under the color of law.  In this case, the

9    parties have stipulated that the defendants were acting

10   under color of law, so you should accept that as a proven

11   fact.

12          Fourth:  Mr. Hoever must prove there is a causal

13   connection between the retaliatory actions and the adverse

14   effect on speech.

15          A plaintiff suffers adverse action if the

16   defendants' allegedly retaliatory conduct would likely deter

17   a person of ordinary firmness from the exercise of his First

18   Amendment rights.

19          Additionally, a plaintiff need not show that his

20   own exercise of First Amendment rights have been chilled.

21   Instead, adverse action, that is injury, can be established

22   if a plaintiff can show that the retaliatory acts would

23   chill a person of ordinary firmness from exercising his

24   First Amendment rights.

25          If you find in Mr. Hoever's favor with respect to

1    each of the facts that must be proved, you must then decide

2    the issue of Mr. Hoever's damages.  If you conclude (1) that

3    Mr. Hoever's rights were violated by one or more of the

4    defendants; and (2) that Mr. Hoever's injuries have no

5    monetary value or are not quantifiable with any reasonable

6    certainty, you may award nominal damages to Mr. Hoever.

7    Nominal damages are appropriate if a plaintiff establishes a

8    violation of a fundamental constitutional right, even if he

9    cannot prove actual injury.

10         Of course, the fact that I have given you

11   instructions concerning the issue of plaintiff's damages

12   should not be interpreted in any way as an indication that I

13   believe the plaintiff should, or should not, prevail in this

14   case.

15         Your verdict must be unanimous.  In other words,

16   you must all agree.  Your deliberations are secret, and

17   you'll never have to explain your verdict to anyone.

18         Each of you must decide the case for yourself, but

19   only after fully considering the evidence with the other

20   jurors.  So you must discuss the case with one another and

21   try to reach an agreement.  While you are discussing the

22   case, don't hesitate to re-examine your own opinion and

23   change your mind if you become convinced that you were

24   wrong.  But don't give up your honest beliefs just because

25   others think differently or because you simply want to get

 1    the case over with.

 2            Remember that, in a very real way, you're judges,

 3    judges of the facts.  Your only interest is to seek the

 4    truth from the evidence in the case.

 5            When you get to the jury room.  Choose one of your

 6    members to act as foreperson.  The foreperson will direct

 7    your deliberations and speak for you in court.

 8            A verdict form has been prepared for your

 9    convenience.  If y'all could look up, this is the verdict

10    form that I'll send back with you, together with the

11    exhibits introduced during the trial.

12            The top of the verdict form simply is the style of

13    the case, the name of the parties, and the case number.

14            And you're then asked several questions.

15            You're first reminded that your verdict must be

16    unanimous, because it reads, "We the jury unanimously return

17    the following verdict:"

18            And then you've got seven separate questions to

19    ask, and each question is related to a specific defendant on

20    a specific day.

21            So, for example, Question 1 is:  Did Mr. Marks

22    violate Mr. Hoever's First Amendment rights on June 20,

23    2013?

24            The next question is:  Did Mr. Paul violate his

25    rights on a particular day, and so forth.

 1          And so there are seven separate questions related

 2  to different defendants on different days.

 3          If you answer -- you then have an instruction on

 4  page 2 at the bottom in italics that tells you that if you

 5  answer any of these those questions "yes," then you'll

 6  proceed to answer the next question on page 3.  And if you

 7  answer "no" to all of them, then you will be -- your

 8  deliberations will be concluded, and you are to sign and

 9  date the verdict form.

10          And then on page 3 there is a -- the next

11  question, that if you answer any of the questions "yes,"

12  then you are asked about damages.

13          And then there is the place for the foreperson to

14  sign and date the form.

15          So this is the verdict form.  And, again, you're

16  asked a series of questions.  You are then given an

17  instruction in italics telling you what to do next depending

18  on your answer to those questions.

19          That is the verdict form.  I'm handing it to the

20  courtroom deputy.  Again, the verdict form will go back with

21  you together with the exhibits to the jury room for your

22  consideration during deliberations.

23          I'll return your attention to the final page of

24  jury instructions.

25          Take the verdict form with you to the jury room.

 1    When you've all agreed on the verdict, your foreperson must

 2    fill in the form, sign it, and date it.  Then you'll return

 3    it to the courtroom.

 4            If you wish to communicate with me at any time,

 5    please write down your message or question and give it to

 6    the court security officer.  The court security officer will

 7    bring it to me, and I'll respond as promptly as possible

 8    either in writing or by talking to you in the courtroom.

 9    Please understand that I may have to talk to the lawyers and

10    the parties before I respond to your question or message, so

11    you should be patient as you await my response.  But I

12    caution you not to tell me how many jurors have voted one

13    way or the other at that time.  That type of information

14    should remain in the jury room and not be shared with

15    anyone, including me, in your note or question.

16            Those are your jury instruction.  I'm handing the

17    copy that I read to you to Ms. Lourcey.  They will be filed

18    on ECF as part of our docket.

19            As I indicated to you, ladies and gentlemen, the

20    next thing to occur is the lawyers and Mr. Hoever, acting as

21    his own lawyer, will have an opportunity to make closing

22    arguments.  I'll remind you that what the lawyers say or

23    what Mr. Hoever says, acting as his own lawyer, is not

24    evidence and must not be considered as such.

25            However, I do encourage you to give Mr. Hoever and

 1    the lawyers during their closing arguments your careful

 2    attention.  The closing arguments are designed to aid you in

 3    your understanding of the case.

 4            Each side is given the same amount of time.

 5    Because Mr. Hoever bears the burden of proof as the

 6    plaintiff, he gets to go first and last.  So he divides his

 7    closing arguments up between two parts.  So he'll speak to

 8    you, you'll then hear from defense counsel, and then

 9    Mr. Hoever will get the last word.

10            I thank you for your patience.  I encourage you to

11    listen carefully to counsel and Mr. Hoever.

12            Mr. Hoever, you may now proceed.

13            MR. HOEVER:  Thank you, Your Honor.

14            THE COURT:  I'm sorry, Mr. Hoever.  One other

15    thing I should tell the jurors.

16            Our courtroom, we have a terrific evidence

17    presentation system now, but I do not have a timer like they

18    have in some of the courtrooms for the lawyers or

19    Mr. Hoever.  So I'm going to give counsel and Mr. Hoever

20    some prompts so they know how much time they've used,

21    because we don't have a clock on the podium that we've just

22    moved there.  So I'm not trying to cut anybody off.  I'm not

23    being rude.  I'm basically just acting as a glorified timer

24    for them.

25            So, Mr. Hoever you may proceed.

1          MR. HOEVER:  Thank you, Your Honor.

2          Good morning, members, ladies and gentlemen.

3   Thank you for coming in today.  We thank you for spending

4   three important days here today -- this week to decide this

5   case.

6          Part of closing argument is to kind of direct the

7   jury on how to analyze the information that has been

8   processed all during this trial.  So I'm going to be in a

9   two-part section.  The first part I'm just going to go about

10  a general guide as to what certain perceptions that you have

11  that you have to determine today.  And on the second part

12  I'm going to come to the legal aspects of it and make sure

13  that all the elements has been clarified to you to find --

14  to come to the final verdict.

15         So I kind of want to give a little illustration as

16  to how we gonna bring things, because if you remember at the

17  beginning, in opening statement, Mr. Gwaltney, the defense

18  counsel, he came in and explained that Mr. Hoever have a

19  different perspective of this, of what had happened.  So

20  the -- let's pay attention here.  He never said Hoever was

21  wrong.  And he never said Hoever lied, but he said Hoever

22  had a different perspective.

23         People have different perception, perspective on

24  things and looking at things differently.  And sometimes I

25  might have a different perspective.  But here we're looking

 1   today at whether what has explained in here, the accusation

 2   that Hoever made against these people, did it occur or not?

 3   That's why the Judge explained that we have to go by the

 4   preponderance of evidence.  Is it more likely or not that

 5   the event did occur -- or the separate offense, did they

 6   occur more likely or not?

 7          Sometimes I'm going to use the overhead projector

 8   a little bit.

 9          (Pause in proceedings.)

10          MR. HOEVER:  We have some evidence that we're

11   trying to -- we listened to some evidence and other stuff,

12   and basically a little mathematical concept as to the

13   arrived-to analysis.

14          (Pause in proceedings.)

15          MR. HOEVER:  For years people been going, and they

16   learn about mathematics, and they say, "Mathematics doesn't

17   apply to nothing and this and that."  If we have two

18   parallel lines, as I have illustrated over here, and I have

19   a line across that's called the transversal, then we can

20   figure out things.

21          So it's the same concept we have today.  We're

22   going to have some information, and we got to take that

23   information and we have to relate them with one another to

24   come to the truth.  The plaintiff said something, the

25   defense said something else.  So we have to take those two

1   things and come up -- and determine which one is the truth.

2          Those two parallel lines, that is what we should

3   take as law.  You get the law.  Those two lines are

4   parallel.  We can't change that.

5          Then you have a transversal that crosses them.  It

6   creates eight angles:  One, two, three, four, five, and

7   six -- excuse me.  Four, five, six, seven, and eight.

8          So now we got to figure out, What is all this

9   about?  If I -- somebody give me this angle to be

10  70-degrees.  That's what information I got.  That's the

11  fact.  By me knowing that one simple angle, I can determine

12  all the other angles by just having the one.  And that's

13  exactly what you are going to have to do today.  I give you

14  this information and I tell you, "Find the other angles for

15  me."

16         How do we do that?  There are some principles.

17         This one, if I slide No. 2 down, it will fit

18  exactly in No. 6.  Those are corresponding angles.

19         If I put -- if I bring 2 down, it will fit in 6.

20  So now with the information that we get on No. 1, we can

21  determine exactly what No. 6 is.

22         One and 2, together they form a straight line.  A

23  straight line is always 180-degrees.  We can't change that.

24  So if this one -- if No. 2 is 70, to find No. 1, I have to

25  take 180 minus 70.  That will get me 110.  And I can bring

 1    that concept down so I can find 5.

 2          No. 2 and No. 3 are vertical angle.  They are

 3    across from each other.  They're congruent.  They're the

 4    same size.  So if I know No. 2, I'll also know No. 3.

 5          I bring that same concept down, I find No. 7.  I

 6    use that flip concept from 1 to 2 to 3 to 4 forming a

 7    straight line so I can find 7 and 8.  You see that

 8    illustration.  If you have one information, one fact, then

 9    you can determine everything else.

10          So Mr. Gwaltney say I have a different

11    perspective.  So now we going to look at my perspective.

12          At the beginning the Judge explained that we have

13    people fighting for this country.  It's a constitutional

14    issue.  Freedom in this country.  There is a constitution

15    that we need to abide by.  That's in my perspective.  People

16    has rights, and they need to enjoy the rights.

17          He says that you have servicemen working overseas

18    and all over the place.  And we need to respect people in

19    uniform.  They fight hard for this country to keep the

20    freedom.

21          As jurors, as he explains, we're doing the same

22    thing.  We're fighting for freedom for this country.  I

23    don't take anything away from people, but we have heroes and

24    we have brave people.

25          So a hero is somebody who goes out of their way to

1    help.  A brave person is somebody who know the risk of

2    something and still goes and do it.

3              Those people who wear a uniform are brave people.

4    Because they wear a uniform does not automatically make them

5    a hero, but they are brave.  When somebody put on a uniform,

6    it's not the uniform that perform, it's the person inside of

7    the uniform.  That uniform give the person authority from

8    the government to work.  And today you have your uniform on

9    as jurors, and you've got to stand up for this country today

10   and for the rules of this country.

11             So I remember on Forensic Files they've been

12   showing about -- one of the episodes about the guy -- he

13   went into -- he's putting on his uniform for one reason, he

14   was a police officer, I think somewhere in Louisiana.  And

15   his reason was, "I'm going to run this neighborhood.  I'm

16   going to deal in drugs.  And everybody who comes in my way,

17   I'm going to clear them out."

18             I don't think that man is a hero.  We know he has

19   a criminal mind.  Even though he's dressed in uniform, he

20   still have a criminal mind.  So it's not the uniform, it's

21   what the person does.

22             A police officer goes and he rescues somebody from

23   a car, he is brave.  It's his responsibility.  That's what

24   he ought to do.

25             THE COURT:  Mr. Hoever, you asked me to let you

```
 1    know when you had used 10 of your 40 minutes.  That's ten.
 2              MR. HOEVER:  Thank you, Your Honor.
 3              And he has then performed his duties.  He did what
 4    he was supposed to do.  But at the same time I see police
 5    officers who go and help the elderly to put their trash out,
 6    hand out bikes to kids, put smile on kid's face.  That's
 7    heroism to me because the police officer that's on the
 8    street, he go outside that to perform that.  That's his
 9    heroic act, and rescue the person out of the car is his
10    bravery act.
11              I've been around this country for quite a while.
12    I work for AT&T, go to different states.  I've been to
13    California, Nebraska, Illinois, Iowa.  So I was kind of
14    impressed with to hear that the court reporter is from Iowa.
15    I've been around Council Bluffs, Des Moines, Anita,
16    Davenport, Coralville, Iowa City.  And one confession,
17    though, the best steak I ever had was in Anita, Iowa.  I
18    don't know if you know where I'm talking about, but it's
19    Anita, Iowa.
20              But now, today, you are here to perform your duty.
21    I went all around this country, and I always hear them say,
22    "This is the home of the braves."  It's never "home of the
23    hero."  There are a lot of heros, but that bravery part,
24    when you put on that brave uniform, you need to stand up for
25    what you think is right.
```

1              That's why we chose you today as jurors, to stand

2    up for what is right.  So you put on your uniform, and

3    you're going to -- we're asking you to perform exactly what

4    is right.

5              Now that you have put on your uniform, we are

6    asking you to uphold the Constitution of the United States,

7    it's First Amendment of free speech is at stake here.  So

8    you have something to do, and we ask you to do it with all

9    right and stand up for it.

10             I'll come back and we'll go toward the

11   constitutional -- the law, how it is set up and the

12   violation that occurred, and I'm going to go step by step so

13   we can see exactly how to analyze what happened, what the

14   truth is, and what actually happened and what did not

15   happen.

16             Therefore, you are brave.  Put on your brave

17   uniform.  If it wasn't so, I wouldn't tell you.  Thank you

18   very much.

19             Thank you, Your Honor.

20             THE COURT:  Counsel?

21             MR. GRAPER:  Thank you, Your Honor.

22             MR. GRAPER:  Thank you, y'all, for coming today

23   and the past couple of days.  We thank you for your time.

24             The defendants and my co-counsel appreciate that

25   you take the time out of your busy schedule to be involved

1   in a trial.  I know you all were compelled to be here, but

2   paying attention and going with us for these past two days

3   is an important thing.

4           We understand that you might be questioning why

5   you are here.  The only thing that Mr. Hoever can gain from

6   this case would be nominal damages, which, as you heard,

7   would be one dollar.  Still, as you -- as the Court

8   previously discussed, it is Mr. Hoever's right to file this

9   lawsuit.  It's one of the constitutional rights that he has

10  as a prisoner.  Yet, based on all the evidence presented,

11  you're probably still wondering why you have been called as

12  a jury member.

13          Mr. Hoever in his opening has asked you to be a

14  hero today and protect the constitutional rights of those

15  like him.  However, he has asked you to do that by

16  considering his perspective of the facts.

17          What he has asked you to do is simply to consider

18  his version, while ignoring the full breadth of the

19  evidence.  Something you will remember from your jury

20  instructions is contrary to what you have been told.  Now,

21  he showed a mathematical geometry problem up there and had a

22  quantifiable answer.  I'm a scientist, too, but I also

23  believe in logic and probabilities.  And as a jury, now,

24  your job is to take all the facts and determine

25  probabilities.  The ultimate probability:  Preponderance of

1    the evidence, 51 percent versus 49 or just above 50, 50.1.

2            But if you look at all the facts and ask yourself

3    the logic of this case, there's lots more probability that

4    are higher than 50 percent that Mr. Hoever's perspective of

5    the facts is wrong.  So why did Mr. Hoever file this

6    lawsuit?  Maybe he believes the claims based on his

7    perception.

8            Specifically, he has perceived a version of skewed

9    events where he is so important that the defendants all knew

10   about his grievances, perceive that his grievances have a

11   message that correctional officers need to stifle, perceive

12   that correctional officer will go out of their way to attack

13   him just because of his grievances, grievances that in the

14   end do not hurt or injure the defendants.

15           But the reality is quite different, and

16   correctional officers are too busy doing their job, which is

17   a job that is very important:  Care, custody and control of

18   inmate.  Their job is to protect them, to feed them and to

19   make sure that they follow the rules.

20           It's not to be bothered and constantly go out of

21   their way in their day.  They work a 12-hour schedule.  The

22   past few days we've had long grueling days.  I've been

23   tired.  I'm not sure, you may have been tired.

24           But even when we had like 10-hour days here, think

25   about a 12-hour day and when you have a job to do.  Are you

1  going to go out of your way and hassle, bother inmates over

2  grievances when your job is very important and you have to

3  stay awake and aware for 12 hours in that day?

4          But, in sum, this case is about Mr. Hoever's

5  perception versus reality.  And it is your job to weigh the

6  evidence and determine what is or is not credible.  And

7  remember, that while both Mr. Hoever and I will go through

8  the evidence in these closing arguments, it will be improper

9  if we distort those facts that you heard over the past few

10 days.

11         In this case Mr. Hoever had to prove the

12 defendants committed an adverse act in response to his

13 grievances and that such an adverse act would have resulted

14 in an inmate, of ordinary firmness, from being prevented

15 from filing a grievance thereafter.

16         Did the defendants act in response to Mr. Hoever's

17 grievances?  The defendants argue that the evidence does not

18 support those claims.  And what actually happened to

19 Mr. Hoever?  The evidence shows nothing happened.

20         Defendants argue that there was no overt action.

21 Mr. Hoever would -- that would even remotely qualify as an

22 adverse action that would chill a person of ordinary

23 firmness from exercising their First Amendment rights, such

24 as filing a grievance or a lawsuit.  Also, if you believe

25 Mr. Hoever's claims, when such an inmate in Mr. Hoever's

```
 1    shoes have filed a grievance after being issued empty
 2    threats, but only if you believe his claims.
 3           So let's go through the allegations as compared to
 4    the testimony and documentary evidence that you have heard
 5    and try to discern what is reality versus mere perception.
 6    So let's go -- there's -- we have six different dates, June
 7    through August 2013.
 8           Let's go June 6, 2013.  Mr. Hoever's allegation is
 9    that Officer Paul threatened inmates with physical harm,
10    including chemical agents, and threatened them that the
11    inmate "would never see the world again" if the inmate
12    threatens or makes an improper statement to officers.
13           First, I'm not even sure what this state has to do
14    with this case, because Mr. Hoever admitted that the alleged
15    threat was not in response to any grievance, but a
16    disrespectful inmate.  An inmate that was not even him.
17           So Mr. Hoever testified that Paul entered the
18    dormitory twice.
19           MR. HOEVER:  Objection, Your Honor.  That's
20    misleading, was never stated.
21           THE COURT:  Overruled.
22           Ladies and gentlemen of the jury -- well,
23    overruled in part, sustained in part.
24           Ladies and gentlemen of the jury, I'll remind you
25    that what the evidence is -- it's up to you to determine
```

 1    what the evidence is.  What neither Mr. Hoever says or

 2    counsel says is evidence, and it's up to you to rely on your

 3    own recollection of the evidence.

 4          Counsel.

 5          MR. GRAPER:  He testified that Officer Paul

 6    entered the dorm twice on June 6th, starting at about 9 p.m.

 7    When he escorted Inmate Clark to confinement.

 8          You've heard us talk about the logs and the

 9    rosters in this case.  The evidence shows he never entered

10    the dorm twice, but once.  That's not what the facts show.

11          You heard Ms. Benton, Brandi Benton,

12    Officer Brandi Benton testify to meticulously noting all

13    events in the log that she kept, she kept right here, where

14    she could see everything that happened in the dormitory.

15    And when the officers came to get Inmate Clark, it was in

16    the vestibule area, and those officers were not

17    Officer Paul.

18          Then you heard later on when we presented our

19    case, Officer Paul come in and testify that he did not

20    threaten inmates as claimed by the plaintiff.  Further, if

21    he had entered and discussed any disrespectful rule or

22    violation with the inmates, he would have been doing his

23    job.

24          Rule violations in a prison are important.  You

25    have to keep a prison orderly.  If you allow inmates to

1  disrespect, threaten, do anything that's outside the rules,

2  that can change the security or interfere with somebody's --

3  make somebody in a situation where they could be hurt.

4  These rules exist for a reason.

5          I ask you to use your common sense.  Take a look

6  at the evidence.  Take a look at who is credible when they

7  were talking.  Was it Officer Paul or was it Mr. Hoever?

8          And it's inevitable that Mr. Hoever, as well as

9  his witnesses, who are or were inmates, will be at odd with

10 correctional officers.  And they may exaggerate events to

11 criticize any officer that is there to do his job.

12         So let's go to the next date, June 20, 2013.

13 First, let's discuss the complex set of allegations of what

14 the facts are as testified by the plaintiff and his

15 witnesses versus the facts as testified as a whole.  And

16 when you weigh all the facts and compare them to each other,

17 what is more probable?

18         Mr. Hoever testified that Officer Paul and Marks

19 went out of their way to visit E-dormitory sometime after

20 nine, before ten o'clock.  He's unsure, unclear, about

21 exactly when it was.  He could only say it was, like, a

22 basketball game being played.

23         And then they came in there, and Marks threatened

24 Hoever to stop writing grievances because apparently the

25 person that answers grievances doesn't want to respond to

 1  grievances, especially Mr. Hoever's.  Even though the

 2  colonel, who apparently is doing his job, to respond to

 3  grievances, apparently doesn't want to respond to

 4  Mr. Hoever's grievances.  So they go out of their way to

 5  enter a dorm and threaten Mr. Hoever.

 6      But let's look at his witnesses.  Mr. Richard

 7  Davidson you saw from Tampa.  He said that Officer Nunez and

 8  Officer Marks entered the dorm at 2 p.m.  We heard testimony

 9  from multiple sources that they do not work on the same

10  shift.

11      A witness of plaintiff also said that Marks

12  entered during a shakedown, with the plaintiff in his

13  boxers.  But plaintiff testified that he was watching a

14  basketball game during these events.  Mr.Rivera testified

15  that he had heard both Marks and Mr. Hoever.

16      Now, Mr. Hoever says that they were all in the

17  vestibule.  Then later when questioned again, Rivera said

18  that he couldn't hear -- he wasn't there when all these

19  things happened.  So what's right?  Was he there, did he

20  hear everything, or was he not?  Mr. Hoever said he was

21  alone.

22      One other allegation is Mr. Hoever says that Paul

23  was not even supposed to be there.  Documents show

24  otherwise.  He was assigned to the dorm.  And it's on

25  multiple documents, assigned to the dorm.  So he was

1   supposed to be there because he was doing his job.

2          You heard -- now let's talk about the evidence

3   based on perception versus reality.

4          You heard testimony and have evidence that shows

5   that a lot of facts don't add up to Mr. Hoever's events.

6   There's also evidence that shows Marks never entered the

7   dormitory.  The defendants argue the evidence does not

8   support the plaintiff's claim.

9          You heard from Officer Dave Wallace -- here

10  (indicating), hard to read his handwriting -- and

11  Officer Paul that there would be a notation if somebody

12  entered the dorm.  Now, obviously there won't be every

13  conversation that goes on noted here, but you consider this

14  like when you sign in somewhere and then you sign out.  Were

15  you there?  There's a log that shows who was there.

16  Officer Marks was not.

17          Now, would an officer go out of his way to sneak

18  into a dorm serendipitously just to go out of their way to

19  threaten about a grievance that doesn't really affect them?

20  Think about it.  That's up to you to decide.

21          Let's go to the 29th.  In this allegation

22  Mr. Hoever says that Marks walked up to Hoever near his bunk

23  and said, I saw you -- and mentions a grievance to him while

24  Officer Paul was watching from afar.

25          Here you have conflicting testimony between the

 1   plaintiff and his witnesses regarding what was said.  First,

 2   Mr. -- the plaintiff's witness said that there was a threat

 3   of bodily harm to Marks.  There was no threat in what the

 4   plaintiff said.  Hoever said only, Marks mentioned a

 5   grievance.  And the same witness of the plaintiff said that

 6   there was not -- he was not in a position to hear what was

 7   said by Marks; he was too far away, his bunk was too far.

 8          Now what does the tangible evidence show?  First,

 9   and I think Mr. Hoever said this -- again, I could be

10   wrong -- that Paul was once again not supposed to be

11   assigned to the dorm.  But he was.  He was supposed to be

12   there doing his job.  And his name appears on multiple

13   documents as being there and doing his job.

14          Second, Mr. Hoever -- and this is stipulated to,

15   where Mr. Hoever's bunk was at.  It was on side 1, side 1 of

16   the dormitory.  And we heard testimony that side 1 is on the

17   left side.  From his own witnesses, side 2 was on the right

18   side.

19          And then you heard testimony from another officer,

20   Megan Millender, that she also takes meticulous duty logs

21   on -- housing logs.  And here it doesn't have Officer Marks

22   entering in side 1 at all.  And if he did, it would be

23   logged.  But instead he enters side 2 with a team of seven

24   other officers that do a search.  They were there from 8:25

25   to 9:16 p.m.  They worked together, in like a

1  buddy-system-type thing, where each one was in teams of two

2  to go do a search, a search that probably inmates didn't

3  want them to do.

4  And inmates on the other side, even though they're

5  not supposed to, because it's not regulated where they could

6  go, they would peek through the plexiglass if they were

7  standing in the bathroom and see that this search was

8  happening, and they could have seen Officer Marks over

9  there.  But did he enter side 1?  No.

10  And you heard from Ms. Benton.  She was there on

11  that team as well.

12  Now, we could have gotten the other people on that

13  team to come in, but we weren't going to waste your time.

14  We felt that the number of witnesses that we had could cover

15  all six days.  And basically 11 witnesses for the defendants

16  for six days, that's less than two witnesses a day,

17  considering we had to talk about all these different days.

18  But we had Ms. Millender.  We had Ms. Benton.  And

19  they both confirmed that Officer Marks never entered side 1.

20  So let's switch gears now.  Now we're talking

21  about another defendant, one that works on the day shift --

22  they worked on the night shift -- Officer Nunez.  And here's

23  the allegation against him that -- in chow hall, which is

24  very busy, you have to run over a thousand inmates in

25  90 minutes to get food in and out on two sides, where you

1   have to have a team of officers that move these inmates

2   around.  Mr. Hoever says that Officer Nunez threatened him

3   of bodily harm due to a grievance that Officer Paul wrote.

4   Said that he was "one of his boys" and showed him a tattoo

5   saying we're in a gang -- or we're in a group, rather.

6           But you have heard testimony that's no gang.  That

7   is a tattoo that's common, that designates a television show

8   program.  It's no different than somebody that likes Looney

9   Tunes and gets a Tasmanian Devil on their arm.

10          And then you heard from George Rivera.  Now,

11  George Rivera was one of the plaintiff's witnesses.  He says

12  that he was right behind Mr. Hoever.  He says he heard all

13  these threats.

14          But then, according to Mr. Hoever, Officer Nunez

15  told him to go stand by the fence.  Didn't tell Mr.Rivera to

16  go stand by the fence.  So Mr.Rivera goes in and eats food.

17  Mr. Hoever's allegedly supposed to wait there the entire

18  time:  Hour, thirty -- 90 minutes until everybody eats.  And

19  then at that point Mr. Nunez threatened him.

20          It doesn't make sense.  Also, when I tried to ask

21  him whether it was lunch or dinner time, when did this

22  happen, Mr. Hoever couldn't tell me, couldn't remember.

23          Now, of all the allegations that we are talking

24  about today, this one would be the highest level of

25  allegation in my book.  You can decide differently.  But if

1    that was the allegation against you, that he's going to

2    threaten you and harm you and he's in a gang or a group,

3    wouldn't that be stuck in your mind?

4         Think about it.  What is credible?  Would that be

5    in your mind?  And when it happened -- even though three

6    years have passed, wouldn't it be stuck in your mind?

7         That logo is everywhere -- I personally haven't

8    seen it, but if other people have, and we've heard testimony

9    that they have -- on cars, apparel.  Even some people get it

10   as a tattoo.  Officer Marks testified that he's seen it all

11   throughout this country.

12      Now, you heard Officer Nunez testify that he was just

13   asking about a grievance.  He says, "And I was wondering.  I

14   didn't know anything about it.  Officer Paul's a good guy.

15   I have no idea why would somebody file a grievance against

16   him."  So I was just asking.

17      Their response?  Mr. Hoever took such offense to a mere

18   inquiry that he needed to threaten Officer Nunez.  And

19   that's what Officer Nunez testified to.

20      Should Nunez have been asking about the grievance?

21   Maybe not.  But does it rise to the level to support

22   Mr. Hoever's case?  The defendants argue no.

23         Then we go to August 2nd.  Not much testimony on

24   this, but Mr. Hoever says that Officer Nunez threatened him

25   about a judge.  "I can do whatever I want.  I'm still here."

 1   This allegation skews -- appears to skew the events that

 2   happened.  Maybe there was a judge, maybe the judge said

 3   something about it.

 4        Who do you believe?  Do you believe Officer Nunez

 5   that the inmate threatened him, that he knows judges, he has

 6   them in their back pocket -- I'll get your job -- or do you

 7   believe Mr. Hoever?  It's up to you to decide.

 8        Now let's go to August 20th, after 2 a.m. in

 9   A-dormitory, where you heard Mr. Hoever testify that Paul

10   goes into the dorm and comes up to his cell and threatens

11   him about a grievance written against Paul.  Now, here is

12   the first time that there is allegedly a grievance against

13   Paul that the defendant is addressing.  But you heard

14   testimony from Officer Joshua Corder and Mr. Wesley Wilson

15   that there is no record of Paul entering A-dormitory at

16   2 a.m.  If he had, it would be documented on three separate

17   logs, not just one, because the confinement unit has special

18   logs.

19        You've heard testimony the only time he entered

20   was not at 2:20, but at 7:48 p.m. to check air.  Because he

21   was on internal security, that was his job, that is what he

22   was there to do.

23        Now, this (indicating) may be the first or second

24   floor, but it doesn't matter because they're on top of each

25   other.

1          Temperature is checked here in the middle, where

2     the person in the office's station can see where they're at.

3     Mr. Hoever's cell was over here, and that's been stipulated

4     to.  If Officer Paul even went over there, seven hours

5     before he was allegedly supposed to do so, then it would

6     have been logged.  But he was only there at 7:48.  He only

7     checked the temperature here, and then he left to go about

8     his job.

9          He didn't enter seven hours later.  There's no

10    record of it.  If there was, it would be on three logs.

11    Once again, we have an allegation that a defendant snuck

12    into a place, to go out of his way to threaten him about a

13    grievance that doesn't affect their job.

14          Maybe, maybe these events didn't happen.  Maybe

15    it's just merely perceived by the plaintiff versus what was

16    actually experienced.  Confinement sometimes induces

17    fantasy, which has a basis in the paranoia of prisons,

18    rather than fact.

19          With this in mind, you need to ask yourselves,

20    Does Mr. Hoever's perception match reality?  Is there a

21    massive effort by officers to go out of their way to

22    threaten Mr. Hoever merely due to his grievances?  Yet,

23    there is no evidence that anything ever happened to him,

24    both by means of tangible injury, such as a DR, or

25    unjustified force, or by means of any documentary evidence

1   to support his claims that the officers in question entered

2   the dormitories where the alleged threats occurred.

3          So does Mr. Hoever's perception match reality, or

4   is it surreality?  Just think about when you're dreaming,

5   you ask yourself, "Is it real"?  Did you actually get hurt?

6   Is there tangle evidence to support the events perceived?

7   Because here nothing happened to Mr. Hoever, and there is no

8   tangle evidence to support his perception of events.

9          THE COURT:  Mr. Graper, that's 30 minutes.

10          MR. GRAPER:  So let's talk about the jury

11   instructions for a minute.

12          Can y'all turn to page 8?

13          (Pause in proceedings.)

14          MR. GRAPER:  So let's presume -- well, let's talk

15   about that Mr. Hoever filed grievances.  That's the first

16   element.

17          But we need to focus on the second element,

18   because that's this case.  Mr. Hoever has to prove for every

19   single one of these dates that these defendants

20   intentionally violated his first amendment rights and, more

21   specifically, that Mr. Hoever must prove -- not the

22   defendants, but Mr. Hoever must prove -- the defendants were

23   aware of his protected speech and took retaliatory action as

24   a result of his protected speech.  And these are grievances

25   mainly, that initiated all of this, that were not even about

1     them.

2          You heard testimony it was Officer Howard,

3     Officer Carraway, not Marks, Paul, or Nunez, initially when

4     this all -- this whole mass thing started.

5          And so as you go through the verdict form and you

6     go through each day, and if you open up the verdict form,

7     y'all -- they don't have it, do they?

8          THE COURT:  They don't have it.  But you can put

9     it up there on the overhead if you want.

10          And, ladies and gentlemen of the jury, sometimes

11    the Court does give the jury both a copy of the verdict form

12    and the jury instructions, but I only used one because I

13    don't want multiple copies floating around.

14          Counsel, you can go.

15          MR. GRAPER:  So we have June 20, 2013.  So "Did

16    Mr. Marks violate Mr. Hoever's First Amendment rights?"  For

17    this to be true, you have to presume that he entered the

18    dormitory.  No evidence of that.  So we argue you must check

19    "No."

20          "Did Mr. Paul violate Mr. Hoever's First Amendment

21    rights on June 20, 2013?"  Well, the evidence says that Paul

22    wasn't even supposed to be there, but when he was there, he

23    was just standing with Marks when all this happened.  But if

24    Mr. Marks was not there... logic.  You have to use logic.

25          One and 2 have to be "No."

1          "Did Mr. Marks violate Mr. Hoever's First

2     Amendment rights on June 29th?  And, similarly, did Mr. Paul

3     on June 29th?  Once again you must presume that all the

4     tangible evidence is wrong, and that Mr. Marks entered side

5     1, sneaky, sneaky, entered side 1 and talked to Mr. Hoever.

6     And he just talked to him.

7          But if you presume and say that the documents are

8     wrong and he actually entered side 1, then you have to ask

9     yourself a question:  Did what he say, was that actually a

10    threat?  "I saw that grievance that you wrote about me.  It

11    was nice."  Is that a threat?  And then Officer Paul, who's

12    stationed there, was watching away from afar, who was

13    supposed to be there, he works there.

14         And then Mr. Nunez, did he violate Mr. Hoever's

15    First Amendment Rights on June 20th, did he threaten him?

16    We've heard evidence that it wasn't Mr. Nunez that

17    threatened the plaintiff, but it was the plaintiff that

18    threatened Mr. Nunez.

19         And you also heard evidence that this supposed

20    group, that they all had an insignia on their arm and it's

21    all membership of, that this is a group that were going to

22    get Mr. Hoever, that Mr. Paul was part of this group.  You

23    saw no tattoos of Mr. Paul's arms, nothing.  There's no

24    group.  It's just a TV show.

25         And then we go to the 2nd.  Now, if you -- if

 1   July 20th didn't happen, how can the 2nd even happen?  At

 2   most, it was a smart-aleck remark by Mr. Nunez'.  Maybe he

 3   shouldn't have said it.  Maybe it was just a response to

 4   Mr. Hoever's threat.  It's for you to decide that.

 5          Then we go on the 20th.  Once again we have a

 6   documentary evidence problem.  Did the 20th ever happen?

 7   The documents say, no.  Mr. Hoever says, yes.  It's up to

 8   you to decide.

 9          And then he had another witness, Mr. Andry, who

10   was there, and he said that he saw this all happening.  But

11   it's been stipulated that Mr. Andry was not even close to

12   being in the same quad as when this happened.  So he

13   couldn't even see Mr. Paul come there.  So there's nothing

14   to corroborate Mr. Hoever's allegations.

15          So you got to think about what -- how does the

16   evidence add up, and what corroborates and what does not?

17   Maybe this case is Mr. Hoever's own type of harassment of

18   the defendants.  Maybe he believes his version of reality.

19   You need to ask yourself whether the complex alternatives of

20   plaintiff's theory and perception of the events is more or

21   less likely than the simple theory that the events never

22   occurred.

23          Defendants argue that the simple solution in these

24   events is that it's not how Mr. Hoever remembers it or

25   perceives it.  I ask you to look at the evidence and decide,

1   based on the concrete version of the world, rather than the

2   world as perceived by Mr. Hoever, and decide in favor of the

3   defendants in this case.

4            Thank you.

5            THE COURT:  Mr. Hoever?

6            MR. HOEVER:  Thank you, Your Honor.

7            THE COURT:  You have 26 minutes, Mr. Hoever.

8            MR. HOEVER:  Thank you.

9            Once again, good morning, members of the jury.

10           I'm going to go now to the second part, where we

11  are going to look at the elements and the evidence that was

12  presented and how we can analyze this all together.

13           First, I want to start with -- let's look at what

14  we are talking about here.  The first thing we have to look

15  at is witness credibility.  On page 4 the -- on page 4 of

16  your verdict form -- jury instruction form, the Judge

17  explain it to you, you've got to look at how the witnesses

18  performed.  What did they tell you?  Who tell -- who told

19  what, and how they represented.

20           You have to look at people's demeanor.  Like when

21  Paul is sitting over there he say, "I don't care if I --

22  anybody file grievance.  I don't care about this."  You got

23  to look at that.  Somebody -- you have a job to perform, and

24  you are performing your job, and you don't care what's

25  happening in the job that you performed?  Let's be real.

1          This is what you got to look at.  When you hear

2     those people talking, how were they talking?

3          So we are looking at this case.  On page 5 they

4     explain "by the preponderance of the evidence," and just

5     like it was stated before, probability goes from zero to

6     100, or either from zero to one; however you want to look at

7     it.  It's 50/50, zero/100.  Impossible, up to certain.  In

8     the middle you have a 50/50 chance.

9          So now the balance is going to be moving.  Is it

10    more likely or not that those things occurs?  Then it is

11    "yes".  If it's less than 50, less likely that it occur,

12    then it's "no".

13         So under No. 6, on page 6 they are talking about

14    color of law.  Color of law is simply, Was the person

15    working for the state?  Was the person working at that time

16    in his official capacity?  That's what "color of law" is

17    going to mean today.  That's what it means.

18         On page 7, the right to write grievances.  A

19    convicted person loses some constitutional right.  He lose

20    his liberty.  He has to stay in prison.  But that doesn't

21    mean that because he's in prison you can do whatever you

22    want to that person and that person is no longer human.

23    Like I said before that person still has mother, sister,

24    family.  He has still the rights that the Constitution give

25    that person to have.

 1              So on page 8, we are going to look at the

 2     elements.  Mr. Hoever must prove that he was engaged in

 3     constitutionally protected speech.  We clarified that.  He

 4     was writing grievances.  The rules -- the law says I had the

 5     right to write grievances.  As it explains, this is an

 6     established principle by constitutional law, that you have

 7     that freedom.

 8              So if I was writing grievances -- the way you got

 9     to realize on No. 1, on the first element, if I was writing

10     grievances and this is why those things happen, No. 1 is

11     established.  All I have to prove is that I was engaged in a

12     constitutionally protected speech.  Writing a grievance is a

13     constitutional protected speech.  One is established.

14              No. 2, Mr. Hoever must prove that the defendants

15     intentionally violated his First Amendment rights.  More

16     specifically, that Hoever must prove that the defendants

17     were aware of his protected speech.  They know I was writing

18     grievances because they came to me and told me, you need to

19     stop writing the grievances.  They are not coming to

20     Mr. Bellelis' desk.  Oh, you wrote a grievance against my

21     buddy -- you heard him say that.  He come and explain it.

22     You wrote a grievance against my buddy.  That's why I'm

23     doing this.  That is what No. 2 is about.  He has to show

24     that he has the intent to stop me.  He came in the

25     instances, You did this, and I want you to stop.  This is

1   how we establish No. 2.

2              No. 3, Mr. Hoever must prove -- we agree upon it

3   already.  Color of law, we both agree that they were

4   performing their duty.  So there is no question whatsoever

5   about No. 3.  We both agree upon it.  Everybody agree upon

6   it.

7              No. 4, I must prove that there was a connection

8   between the action they did and the grievances I wrote.

9   Well, you heard it.  They said, I want you to stop because

10  of that grievance you wrote.  That is the connection it made

11  between one and the other.  The only reason I'm acting today

12  is because of what you did when you wrote those grievances.

13  This is how we establish No. 4.

14             So all those elements are established, and we're

15  going to go now point by point and look and see what was

16  happening.  Well, on page 9 we are going to look at the --

17  how -- I remember defense counsel came up here and says, Oh,

18  he never hurt them.  They never caused him any injury.  They

19  didn't give him a black eye.  They didn't broke his arm, so

20  it's okay.  We don't have to worry about it because they

21  didn't break his right hand.  We don't have to worry about

22  what happened.  That's what defense counsel is trying to

23  tell you just now.

24             Well, let's look at what page 9 says.

25  Additionally, a plaintiff need not to show that his own

1    exercise of First Amendment right have been chilled.

2    Instead, an adverse action, that is "injury," can be

3    established by plaintiff who can show that the retaliatory

4    acts would chill a person of ordinary firmness from

5    exercising his First Amendment rights.

6          I am under custodial authority of those people.

7    When a police officer put on his uniform and he comes to you

8    and he addressed you, you are to follow what this officer

9    tell you.  You don't have a choice.  This person has

10   authority over you.  So if that person give you an order,

11   you got to follow it.

12         But now, if the person give me an order that is

13   incorrect, contrary to what they are trying to tell you --

14   and I'm going to explain a little bit about how it gets into

15   prison -- but contrary to what they are trying to tell you,

16   it seems like all those inmates are all the bad people, and

17   they are the one that are angelic people coming by, and we

18   going to rescue the whole word.  Well, if it was so,

19   wouldn't that be good, but that's not what's happening.

20         So when you are in prison and the officer come and

21   give you a command and is threatening you not to do

22   something -- as I explained to you yesterday, if he said,

23   I'm not going to feed you, a person; that is, the average

24   person would say, Hey, I don't have nothing to eat, so let

25   me back off.  That's what it means to say "a person of

```
 1   ordinary firmness."  The average person, if you threaten
 2   them, they let it go.  But I stood up for it.  I stood up
 3   for it.
 4          So then defense attorney came and he explained to
 5   you how I want this thing.  This is not about money.  All I
 6   can get out of this if something would happen is nominal
 7   damages.  Do you know what nominal damage is?  Nothing more
 8   than a buck.  There is no money in this whole situation.
 9   It's justice.
10          Those people who put on their uniform and are
11   abusing people just because they have -- they're gratifying
12   themselves just because they have uniform on.  That's what
13   we need to stop.  Let it happen in an orderly manner.
14          Supposedly -- supposedly they are so busy working.
15   You don't -- a lot of people never been into prison.  Some
16   people has been in prison.  The majority of problems in
17   prison, or some of the problems in prison, are caused by the
18   officers, certain situations.  The officers are the ones
19   bringing dope into prison.  They are bringing weapons into
20   prison, making weapons, bring them to the prisoner.  Then
21   when something happen --
22          MR. GRAPER:  Objection.
23          THE COURT:  Sustained.
24          You can only talk about things that are in
25   evidence; okay?
```

```
 1            MR. HOEVER:  What?

 2            THE COURT:  You can only talk about things that

 3   have been in evidence, introduced testimony, along those

 4   lines.  So you can talk about the evidence that's been

 5   presented.

 6            MR. HOEVER:  My apologies, Your Honor.

 7            THE COURT:  No worries.

 8            MR. HOEVER:  So they say how busy they are and how

 9   inmates are causing all those problems.  So many problems

10   they are causing.  They are causing so many problems.

11            As you hear Hoever testify, Inmate Nunez said --

12   Officer Nunez said to him, he's going to let inmate attack

13   him.  So they standing in the background.  All he has to do

14   is promise the inmate something and have the inmate go

15   attack Hoever.  And then when something happen, they are

16   going to come and put all the blame on the inmates.  That's

17   how they reward those people that they are working with.

18   Inmates working sometimes for officers and then feeding

19   them.  And now they say I am the one who is doing all these

20   bad things.

21            People -- as they explain to you, they make

22   mistakes also.  One of them explain he left his weapon in

23   his car, or whatever, and he was suspended.  Somebody could

24   have got ahold of that weapon and something terrible happen,

25   and he could have end up in jail.  People end up in prison.
```

1          The fact that somebody is in prison does not

2    necessarily mean that person is a liar.  People get into

3    prison for all kind of different reasons.  And when people

4    in prison -- everybody in prison are -- is not the same.

5    There are some people in prison that did make great impact

6    in society.  A lot of people went to prison, and after they

7    came out of prison, they have quite a -- contributed so much

8    to society that it's everlasting.

9          Let's take an example.  Joseph went to prison,

10   too.  But when he went to prison, it was the training he was

11   getting for some extraordinary thing he had to do in the

12   future.

13         Sometimes people get in prison and they see

14   things.  I came in prison and I learn a lot.  And I can take

15   it out.  I can make it become a good -- make it become a

16   good asset to society, and this is one of the situations.

17   What I have learned in prison I want to bring it to society

18   so it can make an impact and it can be something good for

19   society, that those officers who are supposedly running --

20   being so busy, they're too busy running things they're not

21   supposed to be running.

22         So as you hear testimony, Nunez says, Oh, Hoever

23   was the one threatening me.  How do officers run this

24   prison?  Inmate don't threaten no officer.  The inmate

25   threaten an officer -- as we explain how the guy

1   disrespected -- they are taking you to confinement.  They're

2   trying to confuse you today.

3            As an inmate, they want to put scared of you, like

4   all those inmates so bad.  There are some bad inmates, I

5   agree.  But as you hear in Barber's testimony -- I agree

6   with Ms. Barber.  She was -- I've never seen her treat

7   anybody wrong.  And when she said I said it to her --

8   because those people, they are certain people who are put in

9   the uniform that are mistreating people.  Not all of them.

10  It's just a few of them doing it, and those are the few bad

11  apples that we need to get out.  Those are the people who

12  are causing all this problem.

13           So now I'm looking at the verdict form.  This is

14  what it's all going to be about now.

15           Well, let's look at Marks' situation on June 20.

16  I testified, which was evidence, that he came to the dorm,

17  him and Officer Paul; and they walked in on June 20, get me

18  out of the TV room, take me to the vestibule so that people

19  can [sic] hear what's going on.

20           And they come in and they try -- defense counsel

21  is trying to twist your mind as Rivera said he heard that.

22  That's not what he heard.  He heard something else, but they

23  are taking it and trying to flip-flop it so you can think

24  he's lying.

25           He came in and took me to the vestibule, him and

1   Paul, and they came there and they threatened me.  He told

2   me, Do not write another grievance because Officer

3   Bellelis -- Colonel Bellelis is not coming here to write and

4   answer your grievances.

5           So you hear defense counsel tell you just now that

6   perhaps Mr. Bellelis didn't want to answer my grievances

7   anymore.  Well, his ministerial duty, his job, is to answer

8   grievances, and that's why those people sometimes are doing

9   the things they are doing because those who were supposed to

10  answer the grievances don't.

11          You heard when Officer Marks tried to explain how

12  grievance process go, they try to show you logs.  This is

13  how the logs work.  None of those things are correct.  They

14  are using it -- they say they are so busy.  So if they are

15  so busy, why do we have a one-line thing on 12, 15 sentences

16  for 12 hours?

17          So one event happen in an hour.  Another event

18  happen in another hour, but they are so busy.  Understand in

19  a 12-hour day in prison you have 15 lines logged in, and you

20  want to tell me you have all the events of that day?  A lot

21  of things are missing on that.  They want you to think that

22  it's accurate, that it's black and white, but that's not how

23  things happen.  Sometimes they write things that's not

24  supposed to be there.  Sometimes they write things that

25  never happen.  Sometimes they are just logging in things

1  just to make it look as if they have done something.

2        You see Millender sitting down there.  She can't

3  tell me what she did in a certain time, how it comes that

4  certainly things are not in the log.  She's sitting down

5  there telling you, Oh, I log it in if the man move from side

6  1 to side 2.

7        Where on that document does it say people enter in

8  E1?  Officer enter in E2?  It doesn't say.  It says he

9  enters the dorm.  That's all it says.  But they want you to

10  believe that, Oh, if he would have moved from that corner to

11  that corner, they would log it in.  We would have a notebook

12  on every hour to fill out if that's how things were

13  happening.  So you can obviously see that that's not true.

14        Marks came on the 20th.  He forced me not to write

15  grievances anymore.  All the elements show it.  Officer Paul

16  came with him.

17        Like I explain to you, I have no reason to lie for

18  anybody, none whatsoever.  I am gaining nothing.  I'm not

19  getting money on this.  I just want justice to be served.

20        He came with him.  He stood up there.  They came

21  together and back up.

22        One officer never take you alone somewhere.  He

23  came with him.  He is assisting him in his misconduct.  He

24  is witness -- he is witnessing this.  He is acting on it,

25  and he is participating in it.  That's why you also have to

1    fill out "yes" on No. 2.

2            After, I still get up some courage.  I says, I'm

3    going to be in trouble here, but I got to do something about

4    it.  I'm going to stand up.

5            I wrote another grievance.  So he came here --

6    they -- they threaten me for writing the grievances.  I need

7    your help writing it to the other people.

8            On the 29th he came back.  They both came back,

9    the same two, standing up there, walk up to my bunk, "You

10   wrote that letter, I saw it.  I'm going to get you."And he

11   walked away.

12           Davidson came and explain it.  When he saw that he

13   says, "All those things they are doing to Hoever, this can't

14   happen.  This can't be."  He said, "I'm writing you this

15   statement.  If you need me, find me."  And he came and he

16   testified.

17           They -- we brought a lot of those witnesses up

18   here.  All they say is lie, lie, lie, lie, after lie.  Oh, I

19   never did this.  I never did this.  I never did this.  They

20   never did anything to me.  I just look at them and I don't

21   like them because they're correctional officers.  I'm mad at

22   them.  They -- those people didn't put me in prison.  All

23   they do is care for the prisoner.  People go to prison --

24           MR. GRAPER:  Objection.

25           THE COURT:  He said they "care for."

1          MR. GRAPER:  I thought he said "kill."

2          THE COURT:  No, I believe he said "care."

3          MR. GRAPER:  I apologize.

4          THE COURT:  Overruled.

5          MR. HOEVER:  I said "care."  All they do is care

6   for prisoners.

7       People put in the prison or the county, the judges, the

8   law, that's what put you in prison.  Those people don't put

9   me in prison.  I don't have to be mad at them.

10      I'm not mad that I'm in prison.  I'm in prison.  They

11  found me guilty.  I'm fighting it, but, hey, that's what it

12  is.  Ain't nothing I can do about it.

13          Those people don't do nothing to me for being

14  there, but when I'm there, and they're going to indulge

15  themselves, enjoy themselves, bringing their problems from

16  home and putting it there, that's another thing.

17          Sergeant Nunez explain to you he had so many

18  problems, family problems.  You heard him himself say it.  A

19  lot of problems going on in prison.  People have girlfriend

20  problem, people has wife/children problem.  They can't get

21  along with their neighbor.  They're girlfriend doing

22  something they don't like.  They're coming to work and they

23  want to put it on people, put it on people over there.

24  Can't do that.

25          So, therefore, on No. 3, and No. 4, Marks and Paul

 1   came back on the 29th, make another threat that would stop a

 2   person from doing what they're doing, and that is a

 3   violation that you need to find "yes" on.

 4          On July 20th Nunez came.  Your heard from him.  He

 5   said he talked to me, but he say I told him how I know

 6   judges, how you talking to me.  You talk to a correctional

 7   officer like that, all he has to do is say, "Turn around,"

 8   put the handcuffs on you, take you away.

 9          You can't talk to people like that.  I don't talk

10   to people like that.  I have respect for people.  I don't

11   use profanity.  I don't curse.  I have children.  I have

12   family.  I always try to teach them the right thing.  I have

13   value.  I don't tell people those things.  I don't have to.

14   I know how to carry myself.

15          There is one reason why I try to know those

16   things, because I want to do the right thing.  I want to do

17   the right thing.  That's why I study those rules to see what

18   I can do and what I cannot do.  I found out, hey, I cannot

19   do this, I cannot do this, okay.  I know.  I always obey

20   those rules in prison.

21          So Nunez, he came and he showed me his tattoo.

22   You wrote on my boy, and I'm going to do this, do that, do

23   that to you.  You heard the testimony I gave you.  You heard

24   Rivera was behind me.  We were walking together.  He pulled

25   me out.  And he says, Okay, you, Hoever, you write -- and

1   Rivera continue.  Then he put me to the fence.  After he

2   told me those things, he put me to the fence, and I went, I

3   eat, whatever I did -- no, no.  Rivera went and he eat and

4   he came back up, and then when everybody almost finish, he

5   brought me back and he told me, Okay, this was your last

6   chance on this.  He's going to tell me now I threatened him?

7   Don't let him confuse you.

8          You can't threaten no correctional officer like

9   that.  It doesn't happen.

10          THE COURT:  Mr. Hoever, you've used 40 minutes.

11  You need to wrap things up in the next few minutes.

12          MR. HOEVER:  Thank you, your Honor.

13          So therefore on No.[sic] 20, Nunez did violate my

14  First Amendment right.

15          Then on August 2nd he came back, Oh, you --

16  because if you remember, in the -- he said he never knew

17  Hoever and all those type of stuff in his declaration that

18  you will have to -- as evidence, Plaintiff's Exhibit 1.  You

19  will have it to see where he said he didn't know who I was,

20  and all those types of things, and then he called me, and

21  then he talked to me, and then he didn't say anything, or I

22  said to him, Hey, buddy, I'm going to get you fired.  But

23  still he said later on, I don't remember who Hoever is, or I

24  never knew Hoever.

25          Somebody like that, you will remember.  Somebody

1    come and tell you that, you will remember who that person

2    is.  And the only reason he remember who I am is because he

3    feel like I wrote his buddy.  You hear him there saying it.

4    I wrote his buddy up.  So he's going to get me for that.

5    He's going to starve me to death because I write a

6    grievance, something that I have a protected speech to do.

7            Officer Paul came back on the 20th.  Officer Paul,

8    I'm not going to lie to you, he'll be calm at times, but at

9    times he flies out.  He's showing you a demeanor like, Oh,

10   I'm kind of quiet like that, but he fly out.

11           So he came to me and he says, quietly -- I'm not

12   going to lie to you, he didn't yell and scream at me.  But

13   he woke me up at two o'clock in the morning.  He came in and

14   he says, You wrote a grievance against me?  Why you wrote a

15   grievance say that I lied to you also?

16           I don't want to see his other side, so I stay

17   quiet.  That's what a person of orderly firmness does.  They

18   back off.  So if that what he did would back me off from

19   that, that is a violation.

20           That's why you need to find "yes" also on No. 7.

21           THE COURT:  Mr. Hoever, you have two minutes.

22           MR. HOEVER:  Yes.

23           Therefore, today, not me, we are counting on you

24   today to make a right and proper decision.  And we thank you

25   for your time.  Whatever you decide, that's what it is.

1    It's your decision.  Thank you.

2              Thank you, Your Honor.

3              THE COURT:  Ladies and gentlemen of the jury, you

4    have now heard all the evidence, my instructions on the law,

5    and the closing arguments of the lawyers and in just a

6    moment you will retire to the jury room to begin your

7    deliberations.  In just a few minute you'll hear a knock on

8    the door, and Ms. Lourcey is going to bring you back the

9    evidence; that is, the exhibits admitted during the course

10   of the trial as well as the verdict form.

11             I need to let you know, any time the door opens,

12   if it's somebody delivering -- you run out of water and the

13   CSO's going to bring you something else to drink, or you

14   have a question and send me a note, or Ms. Lourcey brings

15   something back, you must cease all discussion.  Do not

16   discuss the case, do not deliberate, when the doors are open

17   and the court security officer or anyone is present.  Only

18   the eight of you can deliberate, and only the eight of you

19   should do so when the doors are closed.

20             I know we got menus.  I'm going to need some

21   direction from you.  I've already said, "If you need to

22   communicate with me, you write it down in a note.  You don't

23   discuss it with the court security officers.  You write it

24   down, and they will give me the note."

25             If you want me to order lunch, how much time do we

```
 1    need, Ms. Lourcey?

 2              COURTROOM DEPUTY CLERK:  Maybe a half hour.

 3              THE COURT:  We need a half hour.  So you need to

 4    send me a note at 11:30.  That's an hour from now.  Send a

 5    note out if you want me to order you lunch.  And we'll order

 6    it when you send us a note out, and, again, it will take us

 7    half an hour to 45 minutes to get lunch.  But I will need

 8    you to do that.

 9              I thank you for your patience with us.

10              You can take your notes at this time and your copy

11    of the jury instructions.

12              All rise for the jury.

13              (The jury exited the courtroom at 10:26 a.m.)

14              THE COURT:  Please take your seats.

15              Defense counsel's motions are still under

16    advisement.

17              The defense used, just for your own edification,

18    used about 38 minutes.  And, Mr. Hoever, you used right at

19    45.  I said I'd let people go over a couple of minutes,

20    which would be 42 minutes, but you had originally thought

21    40, 45 minutes, and I gave you the 45 minutes.

22              MR. HOEVER:  Thank you, your Honor.

23              THE COURT:  Defense counsel, you used a copy of

24    the exhibits; is that correct?

25              MR. GRAPER:  Yes, Your Honor.
```

```
1              THE COURT:  Mr. Hoever, did you use any of the

2    exhibits?

3              MR. HOEVER:  No, Your Honor.

4              THE COURT:  All right, Ms. Lourcey, if you will

5    please secure the exhibits then that are on the table as

6    well as the verdict form and take them back to the jury.

7              Thank you.

8              While she is doing that, the gentlemen with the

9    Department of Corrections, if you -- if Mr. Hoever needs to

10   use the restroom, he certainly can go downstairs.  Are y'all

11   going to stay up here, or are y'all going to go downstairs

12   while we are waiting on the jury?

13             DEPARTMENT OF CORRECTIONS OFFICER:  We can stay

14   here.

15             THE COURT:  I'm sorry?

16             DEPARTMENT OF CORRECTIONS OFFICER:  We can stay

17   here.  That's fine.

18             THE COURT:  Whatever.  What is y'all's preference?

19             DEPARTMENT OF CORRECTIONS OFFICER:  If he wants to

20   go inside the cell -- if he wants to stay here, we'll stay

21   here with him.

22             THE COURT:  So, Mr. Hoever, you can let them know

23   if you need -- if you want to stay here, they will stay here

24   with you.  If you want to go down to the cell, you can go

25   down to the cell.
```

```
 1              MR. HOEVER:  Thank you.
 2              THE COURT:  Defense counsel, when Ms. Lourcey
 3    comes back -- here she is.  I'll need a cell phone from
 4    y'all.  And I'll need -- if we get a jury question, I'm
 5    going to need at least one lawyer and all three defendants
 6    present in the courtroom.
 7              So I need y'all to be within ten minutes of the
 8    courthouse.  So don't wander much further than Metro or
 9    Aloft if you are going to go out of the courthouse.
10              MR. GWALTNEY:  Your Honor, I'll stay at the
11    courthouse.  I have some further business following these
12    proceedings.
13              THE COURT:  Certainly.  And again, with the
14    defendants, y'all are free to go get something to eat or
15    something, but I need y'all to stay in this general area.
16    Don't get in your car and go somewhere, because I'm going to
17    need everybody back within ten minutes or so.  And that's
18    generous, because if you are at Metro or Aloft, it's going
19    to take more than ten minutes.
20              Anything further from the defense at this time?
21              MR. GRAPER:  No, Your Honor.
22              THE COURT:  Anything further, Mr. Hoever?
23              MR. HOEVER:  No, Your Honor.
24              THE COURT:  All right.  Court is in recess, and we
25    will notify you if we get a question from the jury.
```

1              Thank you.

2              COURT SECURITY OFFICER:  All rise.

3              (The jury trial recessed at 10:30 a.m.)

4              (The jury trial resumed at 11:13 a.m.)

5              THE COURT:  Let the record reflect that all

6    parties are present, counsel for the defense, and, of

7    course, Mr. Hoever.

8              Counsel, we have a jury question, and y'all can

9    help enlighten me:

10             Quote, Judge Walker, may we see the inmate witness

11   statement?  If not, why were they not admitted into

12   evidence?

13             And since they have them in the plural, I guess

14   they mean inmate witness "statements."

15             Does anybody want to help me out?  I don't

16   recall -- I know there are grievances that are filed by

17   inmates.  Does anybody know what an inmate -- did anybody

18   refer to a written statement of an inmate's?

19             MR. HOEVER:  Maybe Ms. Barber's testimony?

20             MR. GRAPER:  It could be the declarations or

21   affidavits that they were referencing during their

22   testimony.

23             THE COURT:  That who is referencing?

24             Oh, you mean the guys --

25             MR. GRAPER:  His witnesses.

```
 1              THE COURT:  Oh, that's what it is.

 2              MR. HOEVER:  But that didn't come into evidence,

 3    did it?

 4              THE COURT:  I know, but they -- both gentlemen

 5    said -- because you asked to refresh their recollection with

 6    those documents.

 7              MR. HOEVER:  Yes.

 8              THE COURT:  And they refreshed their

 9    recollections, and that's what they are talking about.  It's

10    the statements that were provided by your two witnesses that

11    testified on the video deposition -- I mean, by video,

12    rather, and they were not admitted.

13              And so the answer is:  Those documents are not in

14    evidence, and they -- not everything is admitted into

15    evidence.  But I'm not inclined to tell them why.  Nobody

16    sought to introduce them.  I didn't rule on them.  So I'm

17    not sure that -- I like to be truthful with jurors and not

18    hide things or be cryptic, but you didn't seek -- nobody

19    sought to introduce them.  That's why they are not in

20    evidence.

21              But I suppose we can say that the witness

22    statements -- inmate witness statements were not admitted

23    and, therefore -- and you can only consider -- you can only

24    review documents that are in evidence.  And there are a

25    variety of reasons why exhibits are not in evidence.
```

1          But, I mean, what says the defense?

2          MR. GRAPER:  Could you also say that they were

3    just used for the purposes of refreshing their recollection

4    and nothing more, and they are not in evidence?

5          THE COURT:  I don't want to diminish the

6    importance of them, because when they refreshed their

7    recollection, they said what they said.  But that's how they

8    were used.  But to say that it was only used to refresh

9    their recollection suggests some how that what they then

10   said is not in evidence, which it is.

11         Mr. Hoever, what's your thoughts as to how you

12   would ask for me to respond to this?

13         MR. HOEVER:  I think that's fine.

14         THE COURT:  All right.  So I'm going to say they

15   were not -- you cannot see them because they were not

16   admitted.  I mean, I guess I can just tell them also, "You

17   can only consider exhibits that are admitted, and nobody

18   sought to admit these exhibits," so they know that's why --

19   or --

20         MR. GRAPER:  My suggestion, Your Honor, was

21   neither party sought to admit these into evidence.  They

22   were only used --

23         THE COURT:  And I can only send back what was

24   admitted into evidence.

25         Mr. Hoever?

```
 1              MR. HOEVER:  Yeah.  Only their statement is
 2   relevant.
 3              THE COURT:  All right.  Here is what I'm going to
 4   do.  We are going to go ahead and call them in and I'm going
 5   to tell them that the -- those statement were not admitted,
 6   neither side tried to admit them, and I only can send back
 7   documents that were admitted into evidence, and that what is
 8   before them is their testimony.
 9              MR. HOEVER:  And the only thing I can think of,
10   Your Honor, is that maybe Sergeant Barber's statement --
11              THE COURT:  Well, I'm going to verify what they
12   are asking.  That's why I'm brining them in, because I don't
13   want to do this four times.  I'm going to verify who they're
14   talking about; okay?
15              MR. HOEVER:  Yes, Your Honor.
16              COURT SECURITY OFFICER:  All rise for the jury.
17              (The jury entered the courtroom.)
18              THE COURT:  Please take your seats.
19              Ladies and gentlemen of the jury, I think I know
20   who you are talking about, but I want to make sure.
21              The question reads as follows:  Quote,
22   Judge Walker may we see the inmate witness statement?  If
23   not, why were they not admitted into evidence?
24              When you say -- first of all, if that was your
25   question, please raise your hand.
```

1          (Whereupon, the jury responded affirmatively.)

2          THE COURT:  They are indicating that was the

3     question.

4          When you say "inmate witness statement," are you

5     asking about the two gentlemen that testified by video?

6          JURY FOREPERSON:  Yes, sir, yes.

7          THE COURT:  All right.  And the answer to the

8     question is:  I can only -- no, you may not see them.  And

9     the answer to your question, why, is because the only

10    documents that can go back to the jury room are documents

11    that are admitted into evidence.  So if it's not admitted

12    into evidence, I can't send it back.  And so you cannot see

13    them because they were not admitted into evidence.

14         Neither party admitted them.  And, as you saw,

15    it's not that I excluded them.  It's that they were just

16    used for the purpose of refreshing the witness's

17    recollection, and nobody sought to admit them, and so that's

18    why I can't send them back.

19         JURY FOREPERSON:  That's fine.

20         THE COURT:  All right.  And let me find out from

21    you, do you want us to go ahead and order lunch or not?

22    It's 11:30.

23         JURY FOREPERSON:  No, sir.

24         THE COURT:  If y'all change your mind, send us a

25    note.

1              Court is in recess.

2              I'm handing the note to Ms. Lourcey.  It will be

3    marked as Juror Note No. 1.

4              COURT SECURITY OFFICER:  All rise for the jury.

5              (The jury exited the courtroom.)

6              THE COURT:  Please take your seats.

7              Defense, any objection to my instruction to the

8    jury?

9              MR. GRAPER:  No, Your Honor.

10             THE COURT:  Mr. Hoever, did I tell them what you

11   wanted me to?

12             MR. HOEVER:  No, Your Honor.

13             THE COURT:  No objection, or, no, I didn't tell

14   them?

15             MR. HOEVER:  No objection.

16             THE COURT:  All right.  Very good.

17             All right.  I've got another hearing, ladies and

18   gentlemen.  I apologize.  So I'm going to need to get you

19   out and go ahead -- and I'll have Mr. Coleson come in and

20   Mr. Hoever will go out.

21             I'd ask defense counsel, since they just said they

22   didn't want lunch, I'd ask if everybody would stay in this

23   general area.

24             Court is in recess.

25             (The jury trial recessed at 11:20 a.m.)

```
1                (The jury trial resumed at 12:48 p.m.

2                COURT SECURITY OFFICER:  All rise.

3                This court is again in session.

4                THE COURT:  Please take your seats.

5                I'm told that the jury has reached a verdict.  I'm

6      going to bring in the jury in just a moment.  When I do -- I

7      have no idea what the verdict is.  I won't see it until the

8      court security officer hands me the verdict to review.  I'll

9      then read it; that is, I'll publish it.

10                We don't have anybody in the gallery, but let me

11     advise the parties and Mr. Hoever, I don't know if anybody

12     is going to be happy or upset with the verdict, but I will

13     not tolerate any outburst of either joy or regret.  If

14     anybody does not follow that order, and I've made it

15     abundantly clear, we'll have a separate proceeding for

16     contempt this afternoon.  So I expect everybody to conduct

17     themselves appropriately.

18                This jury has given up two [sic] days of their

19     time, and I expect everyone to treat them with respect.

20                Once I announce the verdict, I will give them some

21     final instructions.  I will poll the jury to make sure that

22     it's the verdict of each of the eight jurors.  Everyone will

23     remain in the courtroom.  I'm going to go out in the hallway

24     and thank the jury as they leave and hand them vouchers

25     indicating their payment of $40 a day for the last three
```

 1    days, and then I'll return to the courtroom.

 2              Let's bring in the jury.

 3              MR. GWALTNEY:  Your Honor, real quick before the

 4    jury comes in?

 5              What is your court policy about asking if the

 6    jurors are willing to speak to counsel after?

 7              THE COURT:  I tell them that they are free to

 8    speak with anyone, but they are also free not to speak with

 9    anyone.  So it's entirely up to them.

10              MR. GWALTNEY:  Could we ask you to ask them if any

11    of them would be willing to do so?

12              THE COURT:  Certainly.  I'll tell them that if

13    anybody wants to -- would be willing to speak to counsel

14    outside, afterwards to inquire, you'd be happy to speak with

15    them.

16              MR. GWALTNEY:  Thank you, Your Honor.

17              It would just be counsel and not the defendants

18    themselves.

19              THE COURT:  They're free to do that.

20              MR. GWALTNEY:  Thank you.

21              THE COURT:  Let's bring in the jury.

22              (The jury entered the courtroom.)

23              THE COURT:  Please take your seats.

24              I was going to say, "madam foreperson."  I didn't

25    see who was holding the sheet of paper.

1           Has the jury reached a verdict?

2           JURY FOREPERSON:  Yes, sir, we have.

3           THE COURT:  Will you please hand the verdict form

4   to the court security officer, and he will hand it to me.

5           (Whereupon, the verdict form was handed to the

6   Court.)

7           THE COURT:  All right.  The verdict form appears

8   to be in proper form.

9           I will now publish; that is, I will read the

10  verdict:

11          "We, the jury, unanimously return the following

12  verdict:

13          "Did Mr. Marks violate Mr. Hoever's First

14  Amendment rights on June 20, 2013?

15          "Yes.

16          "Did Mr. Paul violate Mr. Hoever's First Amendment

17  rights on June 20, 2013?

18          "Yes."

19          3.  "Did Mr. Marks violate Mr. Hoever's First

20  Amendment rights on June 29, 2013?

21          "Yes.

22          4.  "Did Mr. Paul violate Mr. Hoever's First

23  Amendment rights on June 29, 2013?

24          "Yes.

25          Question 5.  "Did Mr. Nunez violate Mr. Hoever

```
 1   First rights on July 20, 2013?
 2           "Yes.
 3           6.  "Did Mr. Nunez violate Mr. Hoever's First
 4   Amendment rights on August 2, 2013?
 5           "Yes.
 6           7, "Did Mr. Paul violate Mr. Hoever's First
 7   Amendment rights on August 20, 2013?
 8           "Yes.
 9           Question 8.  "Do you award $1 in nominal damages
10   to Mr. Hoever?
11           "Yes."
12           Signed by the foreperson this 23rd day of
13   September, 2016.
14           In just a moment I will give the verdict form to
15   the clerk who will post it on the docket.
16           Ladies and gentlemen of the jury, I have one last
17   question for you before I give you your final instructions.
18   It's called "polling the jury."
19           I'm not being rude, but rather than calling you by
20   name, I'm going to identify you by number.  But I need to
21   verify that this verdict represents each of your individual
22   verdicts:  You found in favor of the plaintiff as to all six
23   claims, and you awarded one dollar in nominal damages.
24           Juror No. 1, is this your verdict?
25           THE JUROR:  Yes.
```

```
 1              THE COURT:  Juror No. 2, is this your verdict?
 2              THE JUROR:  Yes.
 3              THE COURT:  Juror No. 3, is this your verdict?
 4              THE JUROR:  Yes.
 5              THE COURT:  Juror No. 4, is in your verdict?
 6              THE JUROR:  Yes, sir.
 7              THE COURT:  Juror No. 5, is this your verdict?
 8              THE JUROR:  Yes.
 9              THE COURT:  Juror No. 6, is this your verdict?
10              THE JUROR:  Yes.
11              THE COURT:  Juror No. 7, is this your verdict?
12              THE JUROR:  Yes.
13              THE COURT:  Jury No. 8, is this your verdict?
14              THE JUROR:  Yes.
15              THE COURT:  All right.  Ladies and gentlemen of
16      the jury, I thank you for your time and hard work in this
17      case.  For more than two centuries we've relied on jurors,
18      such as yourself, to decide difficult cases such as this.
19      And we know it's been a long couple of days, and we
20      appreciate your hard work.
21              I do wish to advise you of a privilege that you
22      enjoy as jurors; namely, while you have the right to discuss
23      the case with anyone at this point, you also have the right
24      not to discuss the case.  Whether you do or do not discuss
25      this case will be left up to each of you individually.
```

1            The lawyers -- for example, the defense counsel

2    have asked if you wish to -- if anybody wishes to speak with

3    them, they'd love to have the opportunity to get some

4    feedback from you, if anybody wants to speak with them, out

5    in the vestibule after I release you.  But, again, you also

6    have the right to maintain your privacy.  It's entirely up

7    to you.

8            Is there anything else we can do to make things

9    more comfortable or the way we operate?  We try to make

10   jurors as comfortable as possible.  Is there anything that

11   maybe you need to make me aware of?

12           THE JUROR:  We don't like the white noise.  We

13   want rock and roll music, or classical or Jazz, anything but

14   the white noise.

15           THE COURT:  The white noise is pretty obnoxious

16   when we go sidebar.  I'll acknowledge that.

17           THE JUROR:  Thank you.

18           THE COURT:  Thank you.

19           I hope all of you have a pleasant weekend and

20   enjoy the balance of the afternoon.

21           Again, we thank you for your hard work.

22           I'm going to come back in just a second.  It's not

23   much, but we have a voucher to show you.  You will each be

24   mailed a check for $120, $40 for each day that you were

25   here.  You will also get mileage.

1          Normally, I think, the clerks have told me, it

2    wakes about two weeks.  If any of you need anything other

3    than the documents we've provided, including this document

4    to provide to your employers, don't hesitate to call

5    Ms. Lourcey, and then she'll be able to get you an

6    additional letter either from the clerk's office or from me,

7    whatever you employers need.

8          On occasion employers don't like our paperwork.  I

9    know that as a state court judge, the00 Leon County school

10   system never liked the clerk's letter.  I always had to

11   write a letter on my own stationary for every juror that

12   served that worked for the school board.  I didn't ask, I

13   just wrote it.  So if any of you need any further

14   documentation, let me know.

15          So I'm going to follow you out.

16          All rise for the jury.

17          (The jury and the Court exited the courtroom.)

18          COURT SECURITY OFFICER:  All rise.

19          (The jury trial recessed at 1:00 p.m.)

20          (The jury trial resumed at 1:15 p.m.)

21          THE COURT:  Please take your seats.

22          Counsel, I asked, and they may at some point

23   contact y'all, but they want to go home.  They don't want to

24   talk today.

25          MR. GRAPER:  I understand, Your Honor.  It's

1    Friday afternoon.

2              THE COURT:  I'm going to -- I'll direct the clerk

3    to enter judgment today.  Actually, the clerk will enter

4    judgment in the amount of one dollar for Mr. Hoever.  So

5    I'll enter an order directing judgment be entered.

6              I've considered -- of course, had taken the motion

7    under advisement by the defense.

8              The motion is denied for the reasons I've

9    previously stated.  I find that there is -- I find that

10   there is -- the legal standard is correct, and I find the

11   type of alleged statements that were made directed toward

12   Mr. Hoever could amount to an adverse action.

13             I want to make plain, I'm not saying what I would

14   have found had I been on the jury.  In fact, they asked me

15   that, and I told them absolutely not.  What I would have

16   found is irrelevant.

17             The question is, was there -- were there facts

18   from which the jury could determine that the events occurred

19   that could give rise to a violation, and Mr. Hoever's

20   testimony, if accepted as true, coupled with other evidence

21   that would be consistent with his testimony, including his

22   other witnesses, certainly, it was up to the jury to resolve

23   those factual disputes, and they resolved them in his favor,

24   and I find that there is sufficient facts.  So the Rule 50

25   motion is denied.

 1          With that said, again, I will enter judgment.  I'm

 2    not aware that there is anything else that we need to do.

 3          Let me start with Mr. Hoever.  Mr. Hoever, other

 4    than us entering judgment for the one dollar, consistent

 5    with the jury verdict, is there anything else additional you

 6    believe we need to do in this case?

 7          MR. HOEVER:  No, Your Honor.

 8          Thank you, Your Honor.

 9          THE COURT:  Counsel for defense?

10          MR. GWALTNEY:  No, Your Honor.

11          THE COURT:  All right.  Well, I will enter

12    judgment.  Let me say a couple of things.

13          I know that this entire process is frustrating to

14    both sides, and I understand that.  But this is our system.

15    And if there are disputed facts, we leave it up to a jury.

16    And I know from the perspective of Mr. Hoever the jury got

17    it right, and from the perspective of the defendants they

18    got it wrong.  But that's why we have juries, and they make

19    the decision about what the -- what actually happened when

20    there's factual issues, and factual disputes.  That's how

21    our system works and has worked for 200 years.

22          I do want to thank everybody involved, from,

23    Mr. Hoever, who you could not have been more respectful of

24    the process, of the system, defense counsel, who could not

25    have been more professional and up to and including -- and I

1    should note -- to bending over backwards to hand Mr. Hoever

2    documents, bending over backwards to show him documents and

3    consult with him, bending over backwards to ensure that

4    proper questions were asked and proper arguments were made.

5            I mean, defense counsel could have done what I've

6    had happen in other cases where they try to push the

7    envelope, and then I have to intervene because counsel is

8    not doing the professional thing, but, instead says, I've

9    got a pro se litigant, so I'm just going to clearly ask

10   improper questions and blurt things out.  That was not done,

11   and you are to be commended for that.

12           At the end of the day we all should be good

13   advocates, but, above all, we should be professional and

14   ethical and counsel was.

15           To the three defendants, just as I said to

16   Mr. Hoever, Officers, I honor your work and commitment.  I

17   also thank you for your professionalism and how you

18   presented.  You could not have been more respectful.  The

19   jury said nothing to me, but I can't imagine anybody took

20   offense at how you presented.

21           I've had cases where folks are -- I'm not talking

22   about this type of case, but I've has cases where folks are

23   angry that they have been sued and are belligerent on the

24   stand and belligerent to the lawyers and belligerent to the

25   person who's cross-examining them.  Y'all were nothing but

1   respectful and professional throughout this process.

2          So thank you for how you conducted yourself during

3   the course of the trial.

4          With that said, Mr. Hoever, good luck to you, sir.

5   I believe that's the end of this case.

6          And let me finally thank the folks from -- the DOC

7   representatives here, the transport officers.  The first

8   trial I did as a federal judge, I had a prisoner case.  And

9   they showed up with, like, eight people, circling him, and I

10  spent half my trial trying to say:  Okay, folks, I'm trying

11  to make sure there's a fair trial.  You've got to do

12  security, but I've also got to not tell the jury that we've

13  got Ted Bundy here by circling him like he's getting ready

14  to charge the bench with a knife.

15         Y'all could not have been more respectful to me,

16  as the Court, to the rest of the court staff, the marshals.

17  You have been incredibility respectful of Mr. Hoever and how

18  you conducted yourself.  So thank you, and you are free to

19  transport Mr. Hoever back at this time.

20         Thank you.

21         MR. HOEVER:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         Court is in recess.

24         (The jury trial concluded at 1:21 p.m. on the 23rd

25  day of September, 2016.)

1            (Proceedings adjourned.)

2                    * * * * * * * *

3            I certify that the foregoing is a correct
transcript from the record of proceedings in the
4   above-entitled matter.  Any redaction of personal data
identifiers pursuant to the Judicial Conference Policy on
5   Privacy are noted within the transcript.

6

7   __/s/ Megan A. Hague_____          11/21/2016

8   Megan A. Hague, RPR, CSR            Date
Official U.S Court Reporter
9

10

11

12

13                    **I N D E X**

14

OTHER RECORD MADE                        PAGE
15
Jury Instructions Read By The Court       573
16  Opening Closing Argument By Mr. Hoever    585
Closing Argument By Mr. Graper            591
17  Rebuttal Closing Arguments By Mr. Hoever  610
Jury Question from the Jury               630
18  Verdict By the Jury                      637

19

20

21

22

23

24

25